ALICE J. TEICHLER, *ET AL.*, AND BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY, RESPONDENTS-APPELLANTS, v. CURTISS-WRIGHT CORPORATION, APPELLANT-RESPONDENT.

Argued May 6, 1957—Decided June 24, 1957.

*Mr. Clarence F. McGovern* argued the cause for the appellant Board of Review, Division of Employment Security.

*Mr. Sidney Reitman* argued the cause for the appellants Haussman, Baig and Cocco (*Messrs. Kapelsohn, Lerner, Leuchter & Reitman,* attorneys).

*Mr. Robert P. Knapp, Jr.,* of the New York Bar argued the cause for the respondent Curtiss-Wright Corporation (*Messrs. Smith, James & Mathias,* attorneys; *Mr. Allen C. Mathias,* of counsel; *Messrs. Breed, Abbott & Morgan* of the New York Bar, of counsel).

The opinion of the court was delivered by

JACOBS, J.   The Appellate Division reversed decisions of the Board of Review which found generally that the claimants were eligible for unemployment benefits during a vacation

shutdown of the Curtiss-Wright Corporation's plant. We granted certification under *R. R.* 1:10–2.

During the summer of 1955 the Curtiss-Wright plant had collective bargaining agreements with Local 669 representing production and maintenance employees and Local 300 representing office and clerical employees. The agreements provided that employees with six months' service or more would receive paid vacations; that insofar as possible, vacations would be granted during the summer months; that the employer would endeavor to give the employees a month's advance notice of the period or periods selected for vacations; and that "the final right to the allotment of vacation and the giving of one month advance notice is reserved to the Employer." The agreements contained no provisions for plant shutdowns. In 1950 and 1951 there were no plant shutdowns and vacations were allotted on a staggered basis throughout the summer months. However, in 1952 and in the ensuing years the company followed the practice of shutting down for two weeks during which those entitled to vacations with pay received them and those not entitled to vacations with pay were, in effect, temporarily laid off without remuneration. Mr. Froelich, assistant to the vice-president in charge of industrial relations at Curtiss-Wright, testified that the company had found through experience that staggered vacations involved a "greater hindrance to production" than did a plant shutdown. Mr. Froelich also testified that "around about February" 1955 the company's administrative committee met and decided upon "a two week plant shutdown for vacation purposes"; it fixed the shutdown period as July 23 to August 7 and so advised the appropriate personnel throughout the plant.

In the instant matter the claimants, 17 in all, were not members of unions having collective bargaining agreements with Curtiss-Wright. Ten were not eligible for union membership and were not covered by any bargaining unit; six were eligible for union membership but had not become members; and one was a member of an independent union which had no contract with the employer. They were

relatively recent employees who did not qualify for any vacation with pay (except three who did receive a week's pay and were held eligible by the Board during the second week for which they received no pay). The Board found generally that the claimants were "ready and willing to work and did not want a vacation" but were unable to obtain work with their employer because of the shutdown. It also found that when the claimants accepted employment with Curtiss-Wright they "knew in advance there would be a shut-down" but concluded that they were nevertheless "not ineligible for benefits from July 25, through August 7, 1955, because of the shut-down." The Appellate Division disagreed with the Board's conclusion; it found that the employees' advance knowledge "that there would be a vacation shut-down, during which time they would not be paid" was the "crucial point" and that they were ineligible for benefits under *Glover v. Simmons Co.*, 17 *N. J.* 313 (1955). In *Glover* a majority of the court found (with three Justices dissenting) that an employee who was without work or pay for two weeks because of a plant shutdown for vacation was not eligible for unemployment benefits; the employee there involved was a member of the labor union which had entered into a collective bargaining agreement providing for vacations during the first two weeks of July, thereby evidently contemplating a plant shutdown. After *Glover* was decided the Legislature enacted *L.* 1956, *c.* 65, which amended the statutory definition of "unemployed" to include expressly the instance where the individual employee is on vacation without pay, provided such vacation is not the result of the "individual's voluntary action." *R. S.* 43:21–19. In *O'Rourke v. Board of Review,* 24 *N. J.* 607 (1957), we have set forth the reasons underlying our view that *L.* 1956, *c.* 65, was intended to and did express legislative disapproval and rejection of the statutory interpretation in *Glover;* however, the case now before us arose before the amendment took effect and is not governed by it.

Many courts in other states have been called upon to determine whether an employee who is not entitled to a

vacation with pay and who is ready, willing and able to work but is unable to do so because of a vacation shutdown at his employer's plant, is entitled to benefits under the state's unemployment compensation law. Some of the decisions have been adverse to the employee's claim for benefits. See *e. g., Moen v. Director of Division of Employment Security,* 324 *Mass.* 246, 85 *N. E. 2d* 779, 8 *A. L. R. 2d* 429 (1949); *Matley v. Unemployment Compensation Board of Review,* 164 *Pa. Super.* 36, 63 *A. 2d* 429 (1949); *Jackson v. Minneapolis-Honeywell Regulator Co.,* 234 *Minn.* 52, 47 *N. W. 2d* 449 (1951); *I. M. Dach Underwear Co. v. Michigan Employ. Sec. Comm.,* 347 *Mich.* 465, 80 *N. W. 2d* 193 (1956). Other decisions have favored the employee's claim. See *e. g., Schettino v. Administrator, Unemployment Compensation Act,* 138 *Conn.* 253, 83 *A. 2d* 217 (1951); *American Bridge Co. v. Review Board of Indiana Employment Security Division,* 121 *Ind. App.* 576, 98 *N. E. 2d* 193 (1951); *Golubski v. Unemployment Compensation Board of Review,* 171 *Pa. Super.* 634, 91 *A. 2d* 315, 30 *A. L. R. 2d* 362 (1952); *Adams v. Review Board of Indiana, Ind. App.,* 139 *N. E. 2d* 577 (1957). Distinctions may be drawn between the seemingly conflicting lines of decisions on the basis of particular variations in statutory provisions and collective bargaining terms; the editor of the note in 30 *A. L. R. 2d* 366, 367 (1953) has summarized them with these comments:

"Another situation considered in this annotation arises where there is a general shutdown so that all eligible employees may take their vacations simultaneously. Where such a shutdown occurs, there usually are some employees who, because of the shortness of their service, are not eligible for vacation pay. The question thus arises whether employees in this category are entitled to unemployment compensation for the period covered by the shutdown.

On this question the courts have been divided, some by a process of legalistic hairsplitting concluding that such workers are voluntarily unemployed and therefore not eligible for unemployment compensation, and others taking the more realistic view that such employees are out of work through no fault of their own and therefore are entitled to benefits."

In *Schettino v. Administrator, Unemployment Compensation Act, supra,* the Connecticut Supreme Court of Errors sustained the plaintiff employee's claim for unemployment benefits during a vacation shutdown. The employee was entitled to vacation pay for the first week of the shutdown but not for the second week. Justice Baldwin pointed out that the purpose of the statute was to "provide some income for the worker earning nothing because he is out of work through no fault or act of his own"; that although the plaintiff was on vacation during the first week he was "unemployed" during the second week; and that his unemployment was not "voluntary and self-imposed," though he was a member of the union which had entered into a collective bargaining contract giving the employer "the right to determine the vacation period and to grant certain specific vacation privileges." [138 *Conn.* 253, 83 *A. 2d* 219.] He distinguished cases such as *Moen v. Director of Division of Employment Security, supra; Jackson v. Minneapolis-Honeywell Regulator Co., supra,* and *Mattey v. Unemployment Compensation Board of Review, supra,* as having arisen under statutes which disqualified employees who "voluntarily" left their employment, whereas the Connecticut disqualification was confined to employees who voluntarily left their employment "without sufficient cause" relating to their employment; and he pointed to the fact that the ruling in *Moen v. Director of Division of Employment Security, supra,* was quickly superseded by amendatory legislation. He voiced full approval of *American Bridge Co. v. Review Board of Indiana Employment Security Division, supra* [121 *Ind. App.* 576, 98 *N. E. 2d* 194], where the Appellate Court of Indiana sustained the plaintiff employee's claim for benefits during a two-week shutdown "for the purpose of taking inventory and granting vacations to those who were eligible." There the plaintiff did not have sufficient seniority to be eligible for vacation with pay, and during the shutdown he received no pay and was unable to obtain work, though he was ready, willing and able to work. One of the contentions advanced by the employer was that the statute

was not intended to apply to vacation without pay periods; in response, Presiding Judge Bowen had this to say:

"Appellant advances the further argument that since the express purpose of the Employment Security Act is to avoid the serious menace of economic insecurity, that a vacation without pay is not economic insecurity within the compass of the legislative declaration of public policy. To the worker who depends upon his weekly paycheck for his daily bread, it would appear to be tortuous reasoning indeed to say that a vacation without pay does not constitute 'economic insecurity.'"

In *I. M. Dach Underwear Co. v. Michigan Employ. Sec. Comm., supra,* a divided court held that under the Michigan Employment Security Act the plaintiff employees, though not entitled to vacation with pay, were not eligible for unemployment benefits during a vacation shutdown in accordance with the union contract. The court referred to a distinction between "shutdowns required by virtue of contract and those which occur at the employer's option" and pointed out that in *Schettino v. Administrator, Unemployment Compensation Act, supra,* "the employer had the right to designate a vacation period at any time between May and October, including a time during which the plant might be shut down for other reasons." [347 *Mich.* 465, 80 *N. W. 2d* 198.] In the *Dach* case the court found that the plaintiffs were union employees and had "through their agency entered into a definite agreement with the employer" that the vacation period "should be the week in July in which the 4th of the month fell and, subject to certain provisions, the ensuing week for those having the required seniority," and that "such agreement was not for the sole benefit of the employer but was primarily for the benefit of the employees." In the course of his opinion for the majority, Justice Carr found that the employees were not "involuntarily unemployed" and were therefore not entitled to benefits; in response, Justice Smith filed a dissenting opinion (for three members of the court) which concluded as follows:

"The short of the matter is. that Mary Bretes, and the other claimants, were here unemployed because the employer, in accordance

with his longstanding custom and for his own purposes and convenience, closed his plant during the week of July 4th. She was not entitled to vacation, not eligible for vacation, and not paid for vacation. She did not leave her work 'voluntarily without good cause attributable to [her] employer.' On the contrary, if in fact it could be said that her leaving was 'voluntary,' which is doubtful, she had ample cause directly attributable to her employer, namely, she had no work to go to because her employer had closed the plant. Behind all of this we must constantly bear in mind, is a statutory remedy against the real menace of economic insecurity. A period of no work and no pay, to those of our society who look to their paycheck for their weekly bread, is precisely the kind of economic insecurity that this act was intended to cure and it should be so construed."

█ The particular issue before us must, in any event, turn on a fair construction of our own Unemployment Compensation Law. *R. S.* 43 :21–1 *et seq.* Its purposes are well stated in the declaration of policy in section 2. *R. S.* 43 :21–2. There the Legislature recognized that economic insecurity due to unemployment is a serious menace to the public welfare; that involuntary unemployment is a matter of general concern requiring appropriate legislative action to lighten its burden; and that in furtherance of the general welfare of its citizens there must be the compulsory setting aside of unemployment reserves to be used for "the benefit of persons unemployed after qualifying periods of employment." Subsequent sections identify those who are unemployed (*R. S.* 43 :21–19), those who are eligible for benefits because of their unemployment and the lapse of qualifying periods (*R. S.* 43 :21–4) and those who, though otherwise eligible, are disqualified from receiving benefits. (*R. S.* 43 :21–5). Since the law is remedial in nature, these sections must be liberally construed in the light of the beneficent purposes set forth in section 2. See *Bergen Point Iron Works v. Board of Review,* 137 *N. J. L.* 685, 686 (*E. & A.* 1948) ; *Campbell Soup Co. v. Board of Review, Div. of Employment Security,* 13 *N. J.* 431, 436 (1953) ; *Myerson v. Board of Review,* 43 *N. J. Super.* 196, 203 (*App. Div.* 1957). *R. S.* 43 :21–19 (*m*) (1) provided (prior to its recent amendment) that "an individual shall be deemed 'unemployed' for any

week during which he is not engaged in full-time work and with respect to which his remuneration is less than his weekly benefit rate." Though an employee on vacation with pay receives remuneration without work and is not unemployed under the statute (*Battaglia v. Board of Review, Employment Security Div.*, 14 *N. J. Super.* 24 (*App. Div.* 1951)), a person on vacation without pay, being entirely without both work and remuneration, is unemployed under the clear and unequivocal statutory terminology. The remaining question is whether he is eligible under *R. S.* 43:21–4 and not disqualified under *R. S.* 43:21–5. See *Krauss v. A. & M. Karagheusian,* 13 *N. J.* 447, 455 (1953); *Campbell Soup Co. v. Board of Review, Div. of Employment Security, supra;* Williams, *"Eligibility for Benefits,"* 8 *Vand. L. Rev.* 286 (1954); *Sanders, "Disqualification for Unemployment Insurance,"* 8 *Vand. L. Rev.* 307 (1954); *"Eligibility and Disqualification for Benefits,"* 55 *Yale L. J.* 117 (1945).

*R. S.* 43:21–4 provides that an unemployed individual shall be eligible to receive benefits with respect to any week only if it appears that he duly registered for work, duly made claim for benefits and satisfied the waiting period and (*R. S.* 43:21–4(*c*)) "is able to work, is available for work, and has demonstrated that he is actively seeking work." A physically able employee who wants and seeks work but is unable to find it because his employer's plant has shut down for two weeks and no other suitable work is available to him, readily satisfies both the letter and purpose of the statute. The requirement was intended to exclude those who prefer benefits to paid work, not to exclude those who want paid work rather than benefits. See *Krauss v. A. & M. Karagheusian, supra; Campbell Soup Co. v. Board of Review, Div. of Employment Security, supra.* In *Schettino v. Administrator, Unemployment Compensation Act, supra,* the court rejected the contention that the employee there involved, who received no pay during the second week of his employer's vacation shutdown, was ineligible because he was not available for work and did not make reasonable efforts to obtain work; it determined that the employee

was not out of work because he had left voluntarily without sufficient cause, or had not made reasonable efforts under the circumstances to get other work, but was "out of work because his regular job was not then open to him owing to the act of the employer in shutting down its plant." Similarly in the case before us, the claimants were out of work because of the employer's act in shutting down its plant; they were "ready and willing to work and did not want a vacation"; and the employer has not pressed before us any alleged failure on the part of the claimants to establish that they were "actively seeking work" within the applicable statutory requirement. On the record at hand we are not at liberty to find that they were in anywise ineligible within the terms of *R. S.* 43:21–4(*c*).

*R. S.* 43:21–5 provides that an individual shall be disqualified for benefits under various circumstances there set forth; the only provision which requires mention here is paragraph (a) which disqualifies the individual from receiving benefits for the week "in which he has left work voluntarily without good cause" and for ensuing weeks as there provided. In *Schettino v. Administrator, Unemployment Compensation Act, supra,* the court summarily rejected the contention that the employee had, during the week he did not work or receive any pay because of the company's vacation shutdown, voluntarily left his employment "without sufficient cause connected with his employment," within the meaning of the disqualification clause of Connecticut's statute. [138 *Conn.* 253, 83 *A. 2d* 219.] In *Campbell Soup Co. v. Board of Review, Div. of Employment Security, supra,* this court had occasion to discuss the meaning of the disqualification under *R. S.* 43:21–5(*a*). There union members retired on pension at age 65 and thereafter applied for unemployment benefits. Their retirement was compulsory under the terms of the collective bargaining agreement between the employer and the union. The Appellate Division held that the employees had voluntarily terminated their employment and were disqualified for benefits. We reversed and expressed the view that the leaving was "involuntary

in the statutory sense." In his opinion for the court, Justice Brennan pointed out that the legislative disqualification was "limited to separations where the decision whether to go or to stay lay at the time with the worker alone and, even then, to bar him only if he left his work without good cause"; and he stressed the fact that the employees "did not choose of their own volition to leave the employ," but left because they "had no alternative but to submit to the employer's retirement policy." Similarly, in the case before us the claimants had no choice whatever at the time of the plant shutdown at the employer's direction; the claimants then found themselves automatically out of work and pay though they were ready, willing and able to work. None of them was out of work because of any personal wish or personal consideration, and under the circumstances it is difficult to understand how they can fairly be said to have left work "voluntarily without good cause" within the terms of *R. S.* 43:21-5(a).

In *Glover v. Simmons Co.*, 31 *N. J. Super.* 308 (*App. Div.* 1954), the Appellate Division held that the union member there involved was entitled to unemployment compensation when his employer's plant closed down for vacation purposes in accordance with the collective bargaining agreement and his period of employment was not long enough to qualify him for a paid vacation. The employer contended that the shutdown was with the employee's consent and that consequently he was not "involuntarily unemployed." In response, the court remarked (1) that under *R. S.* 43:21-15 the employee could not lawfully waive his right to unemployment benefits, and (2) that viewed realistically his unemployment could not be said to have been "voluntary." See *Note,* 41 *Va. L. Rev.* 672 (1955). On appeal, the Appellate Division's determination was reversed by a vote of four to three (17 *N. J.* 313 (1955)) in an opinion which voiced the view that "a contract of the class before the court in this case, for a short vacation period, can and should be considered a part of the compensation plan involving the employees as a whole, and is not the involuntary unemploy-

ment calling for relief under the statute." While we no longer adhere to *Glover* (see *Watson v. United States Rubber Company*, 24 *N. J.* 598 (1957)), we note that the circumstances there may be differentiated from those in the instant matter. There a shutdown was seemingly contemplated in the collective bargaining agreement itself, whereas here the company could properly stagger vacations or have a vacation shutdown; and when here the management personnel did decide on the shutdown it was because they believed that that course would best serve the company's interests. In *Glover* the plaintiff was admittedly a union member, whereas here the claimants were not union members. It is true that when the claimants originally accepted employment they knew that the company's ordinary practice was to have a vacation shutdown, but that in nowise justifies the conclusion that they were voluntarily unemployed during the shutdown period when they had no work or pay though they were ready, willing and able to work. An unemployed individual may accept a position to commence several weeks thereafter, or he may accept a position knowing that there would shortly be a layoff for retooling or because of seasonal slack or for other reason; in none of these instances could it fairly be asserted that his later unemployment was voluntary or that he was disqualified for having left voluntarily without good cause. See *Campbell Soup Co. v. Board of Review, Div. of Employment Security, supra,* 13 *N. J.,* at *page* 436 :

"Applicants for work very frequently must take jobs which the employers tell them at the time will engage their services for only a stipulated period. It would not be suggested that voluntary acceptance of such work, knowing in advance its fixed duration, constitutes the leaving of it at the agreed time a voluntary leaving for the purposes of subsection 5(*a*)."

In *Glover* the court cited *W. T. Grant Co. v. Board of Review,* 129 *N. J. L.* 402 (*Sup. Ct.* 1943), along with other cases which stress that the policy of the Unemployment Compensation Law, as set forth in the general declaration in section 2 (*R. S.* 43:21-2), is to afford protection against

"involuntary unemployment." Section 2 does not attempt to define involuntary unemployment or to prescribe the terms of eligibility or disqualification, but remits us to the later operative sections, notably *R. S.* 43:21-4, *R. S.* 43:21-5 and *R. S.* 43:21-19. In the *Grant* case a store clerk left her employment to be married. She later unsuccessfully sought factory work and made application for unemployment benefits. Work was available at her former employer's place of business and the Unemployment Compensation Commission directed her to make application there. However, she declined, saying that she desired the higher compensation to be had from factory work. The court held that she was not entitled to unemployment benefits; in the course of its opinion it found that "by her purposeful and voluntary act she was not wholly available for suitable work, and thus she placed herself, in our opinion, outside of those who, under 43:21-4(*c*), were eligible for unemployment benefits." Similarly in *Valenti v. Board of Review of U. C. C. of N. J.*, 4 *N. J.* 287 (1950), the court found that the claimant had refused suitable work which she did not have good cause to refuse, and was therefore not available for work within the eligibility requirement embodied in *R. S.* 43:21-4(*c*). See also *Ludwigsen v. New Jersey Dept. of Labor & Industry*, 12 *N. J.* 64 (1953); *Krauss v. A. & M. Karagheusian*, *supra*. These cases do not question the benefits rights of a person who is "unemployed" within *R. S.* 43:21-19 since he is unable to obtain work or pay because of a vacation shutdown at his employer's plant; nor do they question that any exclusion of him from benefits must rest on the absence of some eligibility requirement under *R. S.* 43:21-4 or some disqualification under *R. S.* 43:21-5.

It seems to us that a worker who is ready, willing and able to work but is left without work and pay because his employer's plant has temporarily shut down comes fairly within the broad coverage of the Unemployment Compensation Law. The shutdown may be for a relatively short period or it may be for a relatively long period. In either event the worker does not receive the weekly pay check

upon which he and his family are generally dependent for their food and shelter. In good times as well as in bad there are unemployed persons who seek work and finally obtain it at plants which they understand may temporarily shut down thereafter. These persons are truly without employment during the payless shutdowns, even though they will resume when the plants reopen. Where they have fully satisfied the statutory eligibility requirements and are subject to none of the statutory disqualifications, they are justly entitled to the measure of protection against economic insecurity which the Unemployment Compensation Law soundly affords for the welfare of our entire society.

*For reversal*—Justices WACHENFELD, BURLING, JACOBS and WEINTRAUB—4.

*For affirmance*—Justices HEHER and OLIPHANT—2.